**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EDITH BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )     **Jury Demanded** |
| THE CITY OF CHICAGO; CHICAGO POLICE | ) |
| OFFICERS BRIAN MURPHY (Star 10079); | ) |
| JENNIFER UZUBELL (Star 16637); | ) |
| SGT. BRIAN KANE (Star 1815), | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

**INTRODUCTION**

1.    Plaintiff, by and through her attorneys, The Law Offices of Al Hofeld, Jr., LLC, brings this action against defendants pursuant to 42 U. S. C. § 1983 and state law for using unnecessary and excessive force against an elderly woman in her own home when she was taking care of her nonagenarian mother for whom she was plenary legal guardian.

2.    On or about August 13, 2015, at approximately 10:45 A.M., defendant officers Uzubell and Murphy used an excessive and unreasonable amount of force on plaintiff.

3.    As a result, on information and belief Uzubell and Murphy dislocated plaintiff's left shoulder and permanently injured this and other parts of her body while unjustifiably attempting to arrest her.

4.    Uzubell and Murphy's use of excessive force caused plaintiff to experience a great deal of pain on August 13, 2015.  On information and belief, defendant officers permanently damaged several parts of plaintiff's body.  To this day, plaintiff continues

1

to suffer a great deal of pain in her left shoulder, left wrist, left hand, upper back and neck as a result of defendants' actions.  As a further result, plaintiff's range of motion for the entire left side of her body, especially her shoulder and wrist, is now severely limited.  Plaintiff had no problems with any of these areas of her body prior to August 13, 2015.

## JURISDICTION AND VENUE

5.      This action arises under 42 U. S. C. § 1983 and state law.  This Court has jurisdiction over plaintiff's federal law claims pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction over plaintiff's state law claims.

6.      Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events occurred within the Northern District of Illinois, defendant City of Chicago is a municipal corporation located within the district, and, on information and belief, all of the parties reside in the district.

## PARTIES

7.       Plaintiff, who is African-American, is 67-years old.  She is petite and arthritic.  She has had both of her knees replaced.  Plaintiff is a law-abiding citizen.

8.      On information and belief, at the time of the incident, plaintiff was the full-time caregiver and plenary legal guardian for her 94-year old mother, Elizabeth Brown, whose health was declining.  On information and belief, plaintiff was appointed plenary guardian of her mother by the Circuit Court of Cook County in or about September, 2010.  Plaintiff's mother passed away shortly after the August 13, 2015 incident from congestive heart failure.

9.      Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.  The City of Chicago operates the Chicago Police Department ("CPD").

10.     Defendants Jennifer Uzubell (star 16637) and Brian Murphy (star 10079) are Chicago police officers who injured plaintiff, on information and belief.

11.     On information and belief, also present on the scene were Chicago police officers Rashida Young (star 9277) and Jermaine Harris (star 9303).

12.     Defendant Sergeant Brian Kane (star 1815) was also present on the scene and, on information and belief, supervised, ordered and/or authorized the conduct of the officers who injured plaintiff.

13.     On information and belief, Officers Uzubell and Murphy are white; Sergeant Kane is white; Officers Young and Harris are African-American.

14.     When the defendant officers broke into plaintiff's home, used excessive force and committed other unlawful and unconstitutional acts as set forth below, they were at all times acting under color of law and within the scope of their employment as police officers for the City of Chicago.

## FACTS RELATING TO ALL COUNTS

### *Officer Murphy Breaks into Plaintiff's Home and Violates Her Fourth Amendment Right to Be Free From Unreasonable Search and Seizure*

15.     Plaintiff resides at 5539 W. Gladys Avenue in Chicago, IL.

16.     The building at 5539 W. Gladys is a two-flat property that plaintiff owns. At the time of the incident, plaintiff lived in the second floor unit, and her mother lived in the first floor unit.  Plaintiff's son, Madell Brown, also lived in the first floor unit with his grandmother.  The two units are not connected internally; one must exit one unit completely in order to enter the other from an outside door.

17.     On or about August 13, 2015, plaintiff walked down to her mother's unit on the first floor around 10:30 A.M., as usual, to help her mother get ready for the day.

3

18.     After entering her mother's unit, plaintiff walked to her mother's bedroom, which was at the rear end of the first floor unit, and bade her good morning.  The two conversed for 5-10 minutes.

19.     Immediately thereafter, plaintiff heard someone knock on the front door. She immediately walked to the front door in order to answer it.

20.     There is a large window adjacent to the front door of the first floor unit of plaintiff's home.  Plaintiff looked through this window to see who had knocked on the door but did not see anybody standing at or by the front door.  Plaintiff only saw a few police cars parked on the street outside of her home.

21.     Puzzled that someone knocked but hadn't waited at the front door, plaintiff walked toward the rear door of the first floor unit to see if anyone was waiting outside the rear door.  As she walked toward the rear of the house, she encountered Officer Murphy standing in the internal doorway of her son Madell's bedroom, *inside her home*.

22.     On information and belief, Officer Murphy broke into the first floor unit and entered through a window in Madell's bedroom.

23.     Officer Murphy had not properly "knocked and announced" his presence at either of the first floor unit's exterior doors.  Plaintiff would have heard it if any of the defendant officers had "knocked and announced" their presence at either of the first floor unit's exterior doors.

24.     Officer Murphy did not identify himself as a police officer after he broke into plaintiff's home.  He was not in uniform.

25.     Officer Murphy did not have a warrant to enter and search plaintiff's property.

4

26.     Plaintiff was stunned when she saw Officer Murphy in her home.  She had not let him into the home, and all of the doors were locked.  She did not know who Officer Murphy was or what he was doing in her home.

27.     Officer Murphy began to yell at plaintiff: "why didn't you answer your door? We've been pounding on your door repeatedly!"

28.     In fact, nobody had "pounded" on plaintiff's doors.  Plaintiff only heard a single knock, as described above, before she saw Officer Murphy in her home.

29.     Stunned and terrified, plaintiff responded "who are you and why are you in my house?"

30.     Officer Murphy ignored plaintiff's questions and again yelled "we've been pounding on your door!"

31.     Officer Murphy did not have his gun drawn (and no gun was visible on his person), and he did not indicate in any way that he was concerned about his safety in plaintiff's home.  Plaintiff, who is petite, elderly and peaceful, had no weapon of any kind and did not pose any apparent or actual threat whatsoever to Officer Murphy or any of the defendant officers at any time.

32.     Plaintiff could not discern whether Officer Murphy was a police officer because he did not have his uniform on and did not announce his office.

33.     Plaintiff responded, "that doesn't give you the right to be in my house, you must have come in through the window," indicating the window in Madell's room.

34.     Officer Murphy then admitted that he broke into plaintiff's home through the window in Madell's room.

5

35.     Plaintiff continued to ask Officer Murphy, "who are you and what are you doing in my home?"  She asked him these questions several times to no avail.  Officer Murphy never, at any time, announced his office or explained why he was in plaintiff's home.

36.     Throughout the duration of this exchange, plaintiff's mother repeatedly yelled "what is going on?" in a terrified voice from her room.  At the time, plaintiff's mother was bedridden and immobile because she did not have her walker or wheelchair.  At that moment, her walker was in the hallway.

37.     Plaintiff had never, in sixty-six years, heard her mother sound as terrified and stressed as she did during this incident.

38.     Instead of answering plaintiff's repeated questions of "who are you and what are you doing in my home?" as well as her mother's pleas for information, Officer Murphy continued to ignore them both.  He walked past plaintiff toward the rear door of the first floor unit.

39.     He opened the rear door, and Officers Uzubell, Young and Harris charged into plaintiff's home.  None of them were in uniform.  None of them announced their office. None of them had a warrant to enter and search plaintiff's property or to arrest plaintiff.

***Officers Uzubell and Murphy Use Excessive Force on Plaintiff While Falsely Attempting to Arrest Her***

40.     On information and belief, Officer Uzubell led the charge: immediately and without any justification whatsoever, she physically and verbally attacked plaintiff.

41.     Officer Uzubell yelled at plaintiff: "I'll cuff you! I'll take you to jail!"

42.     At no time did Officer Uzubell or any of the other officers tell plaintiff that she was under arrest or inform her of her Miranda rights.

6

43.     At no time did plaintiff commit any crime that would have justified her arrest.  At no time did she resist arrest.  At no time did she, an unarmed, petite, elderly woman, appear or act in a threatening manner towards officers.

44.     Officer Uzubell lunged at plaintiff and grabbed her left arm forcefully in order to handcuff her.  She roughly pulled and twisted plaintiff's arm to turn plaintiff around by force and handcuff her.

45.     In so doing, Officer Uzubell severely exacerbated plaintiff's arthritis and permanently injured her left arm and shoulder.  Plaintiff immediately felt shooting pains in her left arm and shoulder, pains which she continues to experience to this day.

46.     Meanwhile, Officer Murphy roughly grabbed plaintiff's right arm in order to assist Officer Uzubell in cuffing plaintiff.  He pulled plaintiff's right arm behind her back using an amount of force that was undeniably excessive considering the circumstances present: plaintiff was elderly and petite and posed no threat whatsoever to the officers.

47.     While Uzubell and Murphy attempted to cuff plaintiff, plaintiff cried out "please let me go, you're hurting me! Why are you doing this? Why are you here? You shouldn't even be in here!"  She had tears in her eyes.

48.     Uzubell and Murphy continued to pull plaintiff's arms, shaking them back and forth and left and right.

49.     Plaintiff's mother then straggled out of her bedroom and cried out "leave her alone! Why are you doing that, can't you see you're hurting her!"  Plaintiff's mother was sobbing.

50.     Plaintiff's mother had congestive heart disease.  Plaintiff feared for her mother's health and well-being, as she knew that stress exacerbated her mother's heart disease.

She knew her mother's heart was weak. In fact, plaintiff's mother's heart failed and she passed away shortly after this incident.

51. Officer Uzubell continued to bark at plaintiff: "if you don't cooperate, you're going to jail! We'll throw you in jail so you can rot there!"

52. Without any justification whatsoever, Officer Uzubell roughly threw plaintiff against one of the walls three times while she was cuffing plaintiff, injuring plaintiff's neck and upper back.

### *Sergeant Kane Enters*

53. Shortly after Officer Uzubell cuffed plaintiff, Sergeant Kane walked into the first floor unit and ordered Officer Uzubell to remove the handcuffs. Up until that moment, plaintiff's mother was still crying and pleading with the officers to stop hurting plaintiff.

54. On information and belief, Sergeant Kane knew that his subordinates had illegally entered plaintiff's home because he had been on the scene the entire time and had seen Officer Murphy break in through Madell's window.

55. On information and belief, Sergeant Kane ordered and/or authorized his subordinates' illegal entry into plaintiff's home.

56. On information and belief, Sergeant Kane was standing outside of the first floor unit as Murphy and Uzubell assaulted plaintiff and falsely arrested her.

57. After the officers removed plaintiff's handcuffs, plaintiff repeated her previous, still-unanswered questions to Sergeant Kane: "who are you, why are you here?"

58. Sergeant Kane told plaintiff that they were with the CPD and were there to investigate a phone call reporting purported "elder abuse." He did not specify who made the call or when the call was made, despite plaintiff's repeated questions about the same.

59. Plaintiff asked if the officers had any warrants; they admitted that they had no arrest or search warrants.

60. At that point, two representatives from Midwest Care Services entered plaintiff's home. On information and belief, Midwest Care Services was involved in the guardianship proceedings for plaintiff's mother.

61. The two representatives asked plaintiff "where is your mother?" and plaintiff's mother answered, "I'm right here, I'm OK."

62. The two representatives asked plaintiff if her mother was eating regularly and taking her medication, and plaintiff answered yes to both questions.

63. Neither the representatives nor any of the police officers asked plaintiff's mother any questions directly.

64. None of the officers conducted a search of any part of the home or conducted any sort of inquiry beyond allowing the Midwest Care Services Representatives to ask a few questions, as alleged above.

65. The representatives and officers then left plaintiff's home.

66. Before exiting, Sergeant Kane apologized to plaintiff for disturbing her and her mother and apologized for the actions of his subordinates, including the fact that they had handcuffed plaintiff. He apologized that "his officers had come on too strong." Sergeant Kane's apologies were an admission of the impropriety and illegality of his subordinates' actions.

67. Sergeant Kane then wrote his name and contact information on a post-it note and gave it to plaintiff in case she had any further questions or concerns.

68.     None of the officers arrested plaintiff or took her to a police station for further questioning.  On information and belief, the defendant officers never had any justification whatsoever to arrest plaintiff.

69.     As detailed above and below, the defendant officers caused plaintiff lasting emotional and physical injury for no reason whatsoever.

### Defendants Had Notice That Plaintiff Was Her Mother's Legal Guardian and that She Properly Cared for Her Mother

70.     In or about 2013 or 2014, plaintiff's mother, who had dementia, called CPD and ask for assistance on three or four separate occasions.

71.     Each time this happened, plaintiff would show the police officers who arrived on the scene the Court Order appointing her plenary guardian for her mother, and the officers would leave after confirming that her mother was safe and cared for.

72.     On information and belief, the last time that plaintiff's mother called the police, in or about 2014, CPD conducted a thorough investigation of plaintiff's mother's health and well-being.

73.     Shortly after this investigation, a female police officer in charge of elder issues in the 15th Police District assured plaintiff that CPD had repeatedly substantiated plaintiff's mother's well-being and noted the same in their file.  The officer assured plaintiff that the police would not disturb her any more about her mother because she had noted in CPD's file that the elderly person living at 5539 W. Gladys was well-cared for.

74.     Despite abundant notice that plaintiff's mother was well-cared for, on August 13, 2015, defendants broke into plaintiff's home and used excessive force on plaintiff, treating her, a petite, elderly woman, as though she were a violent criminal.  At no time did defendant officers have any justification for using *any force whatsoever* on plaintiff, let alone the

10

excessive amount of force they used. At no time did defendant officers have any justification for arresting, restraining, or handcuffing plaintiff.

### *Defendants Injured Plaintiff*

75.     Defendants' assault and battery of plaintiff caused plaintiff lasting and permanent physical and emotional injury.

76.     Plaintiff never had any issues with her left wrist, hand, arm or shoulder until after defendants assaulted and falsely arrested her.

77.     Plaintiff felt an incredible amount of pain in her left wrist, hand, and shoulder in the days following the incident. Plaintiff continues to feel acute pain in those areas on a daily basis. Plaintiff's range of motion on the left side of her body remains severely limited.

78.     As a result of defendants' assault, plaintiff also sustained bruises to her left wrist and arm, which lasted for several days after the incident.

79.     Plaintiff also never had any issues with her upper back or neck until after defendants assaulted and falsely arrested her. She never had regular headaches or migraines prior to the incident, as she has and continues to have since the incident.

80.     Plaintiff felt an incredible amount of pain in her upper back and neck in the days following the incident. She began to have excruciating headaches lasting several hours. Plaintiff continues to feel acute pain in those areas and continues to suffer excruciating headaches on a regular basis. Plaintiff's range of motion in her upper back and neck also remains severely limited.

81.     Among other treatments, plaintiff's doctor prescribed Tramadol for plaintiff's pain. However, Tramadol is a narcotic and makes plaintiff very sleepy. Therefore, plaintiff often must simply endure severe pain during the day when she is running errands or

when she otherwise needs to be fully alert and can only take Tramadol to relieve her pain at night (or during the day only if she knows she will be home all day).

82.     Plaintiff has been seeing specialists to evaluate and treat continuing pain in her arm, wrist, shoulder, neck and back.

83.     Plaintiff also has experienced a great deal of emotional distress as a result of defendants' illegal actions.

84.     While defendants were in her home, plaintiff was extremely concerned that her mother would suffer a heart attack.  Plaintiff's mother was short of breath and complained about her heart while the police were assaulting her daughter.  Instead of discontinuing their assault and false arrest of plaintiff, the officers told plaintiff's mother to "just calm down" in a patronizing manner.  Plaintiff's mother could not calm down and continued to sob and plead with the officers to leave her daughter alone.

85.     Later the same day, plaintiff's mother's nurse came in to do a regular, previously scheduled check-up on plaintiff's mother.  Plaintiff's mother's blood pressure was much higher than normal, even though several hours had passed since the officers had left.

86.     Plaintiff also felt violated and powerless after the incident.  To add insult to injury, defendants' attack and assault took place in plaintiff's own home.  Defendants did not have a warrant and broke into her home illegally.

87.     Plaintiff was and is extremely fearful that the police will attack her in her home again.

88.     Plaintiff, who never had any issues with the police, now fears them because she has personally experienced their unjustified, totalitarian use of power.

89.     Plaintiff had and continues to have trouble falling asleep.  For the first week following the incident, plaintiff couldn't sleep at all.  She laid in bed all night, replaying the incident in her head, trying to make sense of what happened to her.

90.     Plaintiff's sleep schedule remains irregular.  Prior to the incident, plaintiff never had any issues sleeping and would sleep from 11:30 P.M. until 9:00 A.M.  Now, plaintiff usually can't fall asleep until 3 A.M., but still wakes up at 9 A.M.  Tramadol sometimes, but not always, helps plaintiff fall asleep.

91.     Plaintiff continues to experience a great deal of stress, anxiety and emotional distress as a result of the incident.

***Defendant City of Chicago's Policies, Practices and Customs Caused Plaintiff's Injuries***

92.     The defendant officers' unlawful conduct toward plaintiff was directly caused by CPD and City of Chicago policies, widespread practices, and customs.  Their misconduct was undertaken pursuant to the City of Chicago's pervasive, long-standing, practices and customs relating to its officers' use of excessive force and other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment.

93.     On information and belief, defendant City of Chicago has a pervasive practice and custom of failing to adequately train, supervise, control, discipline and dismiss its officers concerning the use of excessive force and other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment.  Defendant City of Chicago also has a policy of inadequately reporting, reviewing, and investigating use of force and excessive force incidents and other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment.

94.     On information and belief, defendant officer Uzubell, Murphy, Kane and other Chicago police officers have engaged in and continue to engage in a pattern of using unreasonable and/or excessive force and continue to commit other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment.  The City of Chicago has persistently failed to respond, i.e., to identify, scrutinize, and take adequate corrective action concerning officers who repeatedly engage in a pattern of using unreasonable and/or excessive force, warrantless searches, and false arrest/imprisonment of citizens.

95.     Moreover, on information and belief, defendant officers' conduct was undertaken pursuant to and as the direct result of the Defendant City of Chicago's pervasive, long-standing practice and custom of condoning and authorizing CPD officers' pattern and practice of using excessive force and of committing other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment, more frequently and egregiously against African-Americans and other minorities.

96.     By failing to adequately review, discipline and dismiss officers for prior instances of misconduct similar to that committed against plaintiff, the City of Chicago leads police officers to believe with confidence that their actions will not be scrutinized, investigated or disciplined by CPD.  This directly encourages and authorizes future abuses, like the ones involving plaintiff, giving officers license to use excessive force and commit other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment, when and where they want.

97.     Moreover, final city policy-makers are aware of, condone and facilitate, by their inaction, a "code of silence" within the CPD, which further serves to conceal and/or ratify officers' misconduct and authorize it in the future.  Police officers routinely fail to report

instances of police misconduct, lie to protect each other from punishment, and go unpunished for doing so. The defendant officers' conduct toward plaintiff was the direct result of the CPD's code of silence regarding the use unreasonable and/or excessive force, including the use of unreasonable and/or excessive force against minorities, and other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment.

98.    By means of its pervasive practices and failures to remedy its officers' use of unreasonable and/or excessive force, and other violations of the Fourth Amendment, including warrantless searches and false arrest/imprisonment, defendant City of Chicago has manifested and manifests deliberate indifferent to the deprivation of plaintiff's constitutional rights.

99.    These practices and customs directly caused the serious injuries to plaintiff.

## COUNT I – EXCESSIVE FORCE – 42 U. S. C. § 1983

100.    Plaintiff incorporates and re-alleges paragraphs 1-99 of this Complaint as paragraphs 1-99 of Count I. Plaintiff asserts this claim against all defendants.

101.    Defendant officers' conduct toward plaintiff constituted excessive force, in violation of her rights under the Fourth and Fourteenth Amendments to the U. S. Constitution. Under the circumstances, defendants' use of force against plaintiff was totally unnecessary, unreasonable and unjustifiable.

102.    Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to plaintiff's constitutional rights.

103.    Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

104.    The defendant officers' misconduct was undertaken pursuant to and as the direct result of the defendant City of Chicago's policies, pervasive, long-standing practices and customs, as detailed above, such that defendant City of Chicago is liable for defendant officers' misconduct toward plaintiff.

105.    As the direct and proximate result of defendant officers' misconduct, plaintiff has suffered and continues to suffer physical injury to her left shoulder, left arm, left wrist, left hand, upper back and neck, as well as severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

## COUNT II – 42 U. S. C. § 1983 – WARRANTLESS ENTRY INTO PROPERTY

106.    Plaintiff incorporates and re-alleges paragraphs 1-105 of this Complaint as paragraphs 1-105 of Count II.  Plaintiff asserts this claim against all defendants.

107.    As set forth above, defendant officers forcibly entered plaintiff's home without a search warrant and without any exigent circumstances that would justify the warrantless entry.

108.    Defendants also violated the knock-and-announce rule of the Fourth Amendment.

109.    Defendants took these actions without any lawful basis or justification.

110.    Defendant officers' actions violated plaintiff's rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

111.    Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiff's constitutional rights.

112.    Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

16

113.    The defendant officers' misconduct was undertaken pursuant to and as the direct result of the defendant City of Chicago's policies, pervasive, long-standing practices and customs, as detailed above, such that defendant City of Chicago is liable for defendant officers' misconduct toward plaintiff.

114.    As a result of defendant officers' misconduct described in this Count, plaintiff has suffered injury, including lasting and permanent physical injury and emotional distress.

## COUNT III – FALSE ARREST AND FALSE IMPRISONMENT - 42 U. S. C. § 1983

115.    Plaintiff incorporates and re-alleges paragraphs 1-114 of this Complaint as paragraphs 1-114 of Count III.  Plaintiff asserts this claim against all defendants.

116.    When defendants Uzubell and Murphy handcuffed plaintiff, they unlawfully deprived her of her liberty to move about, despite the fact that she had done nothing illegal and that the officers had no probable cause for her arrest and imprisonment.  This violated plaintiff's rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

117.    The fact that the officers removed the handcuffs almost immediately and that they did not officially place plaintiff under arrest or charge her with any crime is evidence of the unlawful nature of defendants' restraint of plaintiff.

118.    At the time that defendants attempted to arrest plaintiff by handcuffing her, there was no indication that plaintiff had committed, was committing or was about to commit any offense.  Defendant officers did not have reasonable grounds to believe that plaintiff had committed any offense.

119.    Through physical force and the invalid use of legal authority, defendants acted to arrest, restrain and confine plaintiff to a bounded area.

17

120.    The misconduct alleged in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to plaintiff's constitutional rights and those of others.

121.    Plaintiff was acutely aware of and was harmed by defendants' confinement, as detailed above. *Inter alia*, plaintiff was extremely concerned about her mother's stress levels and her heart health. Plaintiff also suffered a great amount of direct physical pain and injury due to defendants' actions.

122.    The defendant officers' misconduct was undertaken pursuant to and as the direct result of the defendant City of Chicago's policies, pervasive, long-standing practices and customs, as detailed above, such that defendant City of Chicago is liable for defendant officers' misconduct toward plaintiff.

123.    As a direct and proximate result of defendant officers' actions as described in this Count, plaintiff suffered and continues to suffer serious, long-term psychological and emotional trauma, distress and other injuries, including but not limited to those detailed above.

## COUNT IV – BATTERY – State Law Claim

124.    Plaintiff incorporates and re-alleges paragraphs 1-123 of this Complaint as paragraphs 1-123 of Count IV. Plaintiff asserts this claim against defendant City of Chicago, Uzubell, Murphy, and Kane in their individual and official capacities.

125.    In the manner set forth above, the conduct of defendant officers, acting under color of law and within the scope of their employment, constituted unauthorized, direct, physical contact to plaintiff's person that was harmful and offensive to plaintiff. Plaintiff did not consent to this contact.

18

126.    Defendants' contact was undertaken willfully and wantonly and proximately caused plaintiff's injuries.

127.    The misconduct alleged in this count was objectively unreasonable and was undertaken intentionally and with malice, willfulness, and reckless indifference to plaintiff's constitutional rights and those of others.

128.    Defendants' misconduct alleged in this count was undertaken with an actual or deliberate intention to harm and with an utter indifference to or conscious disregard for the safety of others.

129.    Defendants intended to cause plaintiff harm in that they knew with substantial certainty that harm would result to plaintiff from roughly grabbing and shaking plaintiff's arms and wrists and slamming plaintiff repeatedly against a wall.

130.    As a direct and proximate result of defendant officers' misconduct described in this Count, plaintiff suffered and continues to suffer serious, long-term, physical, psychological and emotional trauma, distress and other injuries, including but not limited to those detailed above.

131.    In committing the acts and omissions alleged above, defendant officers were at all times members and agents of the CPD and were acting within the scope of their employment.

132.    Defendant City of Chicago is liable as principal for all common law torts committed by its agents within the scope of their employment.

**COUNT V – FALSE ARREST AND FALSE IMPRISONMENT – State Law Claim**

133. Plaintiff incorporates and re-alleges paragraphs 1-132 of this Complaint as paragraphs 1-132 of Count V. Plaintiff asserts this claim against defendant the City of Chicago and defendants Uzubell, Murphy, and Kane in their individual and official capacities.

134. When defendants Uzubell and Murphy handcuffed plaintiff, they unlawfully deprived her of her liberty to move about, despite the fact that she had done nothing illegal and that defendant officers had no probable cause for her arrest and imprisonment.

135. The fact that the officers removed the handcuffs almost immediately and that they did not officially place plaintiff under arrest or charge her with any crime is evidence of the unlawful nature of defendants' restraint of plaintiff.

136. At the time that defendants attempted to arrest plaintiff by handcuffing her, there was no indication that plaintiff had committed, was committing or was about to commit any offense. Defendant officers did not have reasonable grounds to believe that plaintiff had committed any offense.

137. Through physical force and the invalid use of legal authority, defendants acted to arrest, restrain and confine plaintiff to a bounded area.

138. The misconduct alleged in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to plaintiff's rights and those of others.

139. Plaintiff was acutely aware of and was harmed by defendants' confinement, as detailed above. *Inter alia*, plaintiff was extremely fearful of her mother's stress levels and her heart health during this incident. Plaintiff also suffered a great amount of direct, physical pain and injury due to defendants' actions.

140.     As a direct and proximate result of defendant officers' actions as described in this Count, plaintiff suffered and continues to suffer serious, long-term psychological and emotional trauma, distress and other injuries, including but not limited to those detailed above.

141.     In committing the acts and omissions alleged above, defendant officers were at all times members and agents of the CPD and were acting within the scope of their employment.

142.     Defendant City of Chicago is liable as principal for all common law torts committed by its agents within the scope of their employment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in her favor and against defendants for:

a.     Compensatory damages;

b.     Punitive damages;

c.     Reasonable attorney's fees and litigation costs and expenses;

d.     Appropriate equitable relief; and

e.     Such other or further relief as the Court deems appropriate.

Respectfully submitted,

/s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Hanan E. Van Dril
LAW OFFICES OF AL HOFELD, JR., LLC
1525 East 53rd Street, Suite 832
Chicago, Illinois  60615
(773) 241-5844
(773) 241-5845 (FAX)

## **JURY DEMAND**

Plaintiff demands trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## **NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

22